

**FILED**

Nov 02 2020, 9:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Assistant Section Chief, Criminal
Appeals
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

David R. Hennessy
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

Justin Jones,

*Appellee-Defendant.*

November 2, 2020

Court of Appeals Case No.
20A-CR-664

Appeal from the Marion Superior
Court

The Honorable Grant W. Hawkins,
Judge

Trial Court Cause No.
49G05-1802-F2-5853

**Najam, Judge.**

## Statement of the Case

[1]  The State appeals the trial court's order that the State produce a confidential informant ("CI") for an interview with Justin Jones' counsel.  The State raises one issue for our review, namely, whether the court abused its discretion when

it ordered that Jones' counsel be permitted to conduct a face-to-face interview with the CI.

[2]     We affirm.

## Facts and Procedural History

[3]     On June 3, 2017, Sarah Thompson was at home with her two small children. At some point that night, two males, one masked and one unmasked, kicked in the door to her home. The men "tied [Thompson] up" and "assaulted her" while they passed a handgun "back and forth." Appellant's App. Vol. 2 at 28. The men held Thompson and her children for several hours while they searched the house. Ultimately, the men stole jewelry, shoes, purses, gaming consoles, and a vehicle. After the men had left, Thompson was able to provide Indianapolis Metropolitan Police Department ("IMPD") Detective James Hurt with a description of the unmasked man.

[4]     The next day, IMPD officers responded to a report that shots had been fired at a different location, and they discovered the stolen vehicle. Officers also found a cell phone next to the vehicle and a black mask, a baseball hat, and a flip phone inside the vehicle. Officers were able to determine that the cell phone they had found next to the car belonged to Jones.

[5]     On August 10, IMPD Lieutenant Leo George, who was investigating a group of "serial burglars" in Indianapolis, spoke with a CI who had information about a home invasion. Appellant's App. Vol. 3 at 165. At the time, the CI was in custody following an arrest for an unrelated crime. The CI provided Lieutenant

George with "several specific details" about the offense that were only known to the victim and law enforcement officers. Appellant's App. Vol. 2 at 30. The CI informed Lieutenant George that David Johnson and Jimmy Hapner were involved in the offense and that an individual known as Haughville Cody had planned the robbery.

[6] Lieutenant George recognized Johnson as a member of the group he was investigating. He also determined that Thompson's description of the unmasked assailant matched a booking photograph of Hapner. And Lieutenant George learned that Jones, whose middle name is Cody, had a connection to the area of Indianapolis known as Haughville. Lieutenant George then forwarded the information regarding the possible subjects to the officers who were investigating the robbery at Thompsons' home. Lieutenant George did not provide any information regarding the CI's identity to the investigating officers, and the investigating officers never spoke with the CI.

[7] In April 2018, the State charged Jones with burglary, as a Level 2 felony; robbery, as a Level 3 felony; criminal confinement, as a Level 3 felony; kidnapping, as a Level 3 felony; kidnapping, as a Level 5 felony; and auto theft, as a Level 6 felony. The State also charged Johnson and Hapner with various crimes.

[8] The three co-defendants deposed Lieutenant George. During his deposition, the defendants asked Lieutenant George several questions about the information he had learned from the CI. Lieutenant George declined to answer some of those questions on the ground that the answers could provide

information about the CI's identity. Thereafter, Johnson filed a motion to compel, in which he asked the court to direct Lieutenant George to answer the questions regarding the CI.[1] Jones joined in that motion, and he filed a brief in support. In that brief, Jones asserted that he sought the answers to the questions regarding the CI because "[o]nly two people committed the crime," and, if there was a third person involved, "it certainly could have been [the CI] who apparently knew so much and whose identity is being hidden." *Id.* at 137. And Jones asserted that he "has a constitutional right to explore that possibility." *Id.*

[9] The State responded and asserted that Jones was seeking "information that would reveal the identity" of the CI. *Id.* at 173. The State also asserted that it had "properly invoked the informer's privilege" and that Jones had not shown "by actual evidence" that the disclosure would be "relevant," "helpful," or "essential to a fair trial." *Id.* at 174. Accordingly, the State asserted that "disclosure of the [CI] in this case would not be appropriate[.]" *Id.* at 176.

[10] At a hearing on the motion on November 11, Jones asserted that he needed the information regarding the CI in order to learn if, during a "huge delay" between the offenses and the filing of the charges against him, the victim had provided any information to the CI. Tr. at 7. The State responded and asserted that the CI had simply provided "suspect information" that "got the detectives from

---

[1] Neither party has provided a copy of Johnson's motion to compel on appeal.

point A to point B" and that none of the information from the CI "is going to be used." *Id.* at 8. The trial court asked the parties to submit additional briefing on the issue.

[11] The court held another hearing on the motion to compel on January 11, 2019. At that hearing, Jones asserted that the information from the CI was important because it "led to everything else." *Id.* at 19. And Jones maintained that the "credibility and reliability" of that information was "critical" to his defense. *Id.* The State contended that Jones was merely on a "fishing expedition" and that he could not point to actual evidence that he believed he could obtain from the CI. *Id.* at 24. The trial court directed the parties to work together to provide as much information as possible.

[12] The parties were able to work together, and Jones was able to gather some information regarding the source of the CI's information. However, the parties returned to court for another hearing on the motion on April 18. At that hearing, the State asserted that the CI has "never been anybody who's ever going to be a witness" at trial or who "was involved in this." *Id.* at 64. The State also reiterated that the information from the CI simply pointed officers in the "direction of a place to look" for suspects, but that the State did not file charges based on the CI's information. *Id.* at 72. Rather, the State asserted that Jones' cell phone found near the stolen car was what "led to" his arrest. *Id.* Jones' counsel stated he needed the information regarding the CI and that he "would like" the CI's identity because "you can't test a person's credibility much without it." *Id.* at 73. But Jones' counsel stated that he "would accept

any limitations that would protect [the CI's] identity," including an order to not share the CI's identity with Jones. *Id.*

[13] Following that hearing, the parties agreed to allow Jones' counsel to question the CI in a manner that did not disclose the identity of the CI. According to that agreement, the parties arranged for a telephone interview during which the CI answered questions using a machine to disguise the CI's voice. However, the machine did not work, so the parties were not able to conduct the interview.

[14] The parties then agreed that Jones could submit written questions to the CI, which Jones did on May 16. Lieutenant George then asked the CI questions, and the State recorded those questions and answers using a machine to alter the CI's voice. The State provided a copy of that recording to Jones on August 20. However, Jones could not understand the recording, and he asserted that some of the CI's answers "begged follow up questions," which Jones could not ask due to the format of the interview. Appellant's App. Vol. 2 at 241. Accordingly, on August 22, Jones filed a second motion to compel.

[15] At another hearing on the motion to compel, the parties agreed that the State would provide a transcript of the CI's interview to Jones and, if Jones wanted to question the CI further based on the transcript, the parties would arrange an interview during which someone would relay questions and answers to and from the informant. The parties then conducted another interview with the CI. During that interview, Jones relayed questions over the phone to the prosecutor, who then relayed them to the CI. However, Jones became concerned with that format because "there was a significant pause" between

Jones' questions and the CI's answers. Appellant's App. Vol. 3 at 141. As such, Jones filed a supplement to his motion to compel. In that motion, Jones asserted that it was "impossible to know what was going on" or whether "there was consultation regarding the answers" because Jones could not confront the CI in person. *Id*. Jones also asserted that the CI's answers "contradicted" the information that Jones had obtained from Lieutenant George in "some significant respects." *Id*. Jones then asserted that the CI was now a necessary witness for trial, and Jones requested a face-to-face interview with the CI.

[16] The State responded and reiterated its argument that it had invoked the informer's privilege and that Jones' argument consisted only of bare assertions "devoid of any factual support." *Id*. at 156. Specifically, the State asserted that, even if the "alleged inconsistencies" between the CI's answers and Lieutenant George's statements existed, those inconsistencies "would still not constitute actual evidence that disclosure of the CI's identity would be relevant or helpful or essential to a fair trial." *Id*. Accordingly, the State alleged that Jones had not met his burden to overcome the privilege.

[17] The court found that the parties had made "three attempts" for Jones to question the CI in a manner that protected the CI's identity, all of which had failed. *Id*. at 211. Accordingly, the court ordered the State to produce the CI for a face-to-face interview with Jones' counsel. However, the court ordered Jones' counsel not to ask "any questions that may disclose the [CI's] identity, identifiers, residence, etc." *Id*. at 212. This interlocutory appeal ensued.

# Discussion and Decision

[18] The State contends that the trial court erred when it granted Jones' motion to compel. Our Supreme Court has recently stated that trial courts "have broad discretion on issues of discovery." *Beville v. State*, 71 N.E.3d 13, 18 (Ind. 2017). "Accordingly, discovery rulings—such as rulings on motions to compel—are reviewed for an abuse of that discretion." *Id*. Here, the State specifically contends that the court abused its discretion when it granted Jones' motion to compel because the face-to-face interview between the CI and Jones' counsel would lead to the identification of the CI. And the State asserts that the informer's privilege is applicable in this case to protect the CI's identity.

[19] Under the informer's privilege, the State may withhold the disclosure of evidence that reveals an informant's identity for at least two important policy reasons: preventing retaliation against informants and ensuring that individuals come forward with information to help law enforcement. *Id*. at 19. "The informer's privilege, however, is not absolute: if the accused seeks disclosure, the burden is on him to 'demonstrate that disclosure is relevant and helpful to his defense or necessary for a fair trial.'" *Id*. (quoting *Schlomer v. State*, 580 N.E.2d 950, 954 (Ind. 1991)). If the defendant meets his burden, the burden then shifts to the State to present evidence showing that disclosure is not necessary to the defendant's case or that disclosure would threaten its ability to recruit or use CIs in the future. *Id*. At that point, the trial court must evaluate the evidence and determine whether disclosure is appropriate. *See id*.

[20] However, the State bears the initial responsibility to prove that the privilege applies. *See id*. at 21. Thus, before we determine whether Jones met his burden as the defendant seeking privileged information, we must first determine whether the State properly asserted that privilege. In order for the State to invoke the privilege, the State "must show that the CI's identity would be revealed if the criminal defendant's discovery request is granted." *Id*.

[21] On appeal, the State asserts that it met its initial burden to assert the privilege because the in-person interview will reveal to Jones' counsel "sufficient means to deduce" the CI's identity. Appellant's Br. at 17. Specifically, the State asserts that the face-to-face meeting "will necessarily reveal the informant's physical appearance and a variety of personal characteristics such as mannerisms, voice, and speech patterns" to Jones' counsel, which information will "make it much easier to discover the [CI's] identity." *Id*. at 18.

[22] However, we agree with Jones that the "State never goes beyond an assumption that defense counsel seeing the informant will reveal the informant's identity." Appellee's Br. at 8. Indeed, during a hearing on the motion to compel, the State conceded that it did not know whether Jones' counsel would recognize the CI. And the State acknowledges that, while the in-person interview "might" reveal certain of the CI's identifiers to Jones' counsel, it "may not." Appellant's Br. at 17. But it is not enough to show that the CI's identity *might* be revealed. Rather, it was the State's burden to prove that the CI's identity *would be* revealed as a result of the face-to-face interview. *See Beville*, 71 N.E.3d at 21 (emphasis added).

[23]    If we were to adopt the State's position, we would, in essence, preclude the disclosure of any communications in which someone could *potentially* identify a CI. We decline to adopt that position. Here, the court fashioned a solution that balanced Jones' right to information that would allow him to prepare his defense with the State's desire to keep the CI's identity hidden when it allowed Jones' counsel to interview the CI without asking any questions that would reveal the CI's identity. Because the State did not meet its burden to demonstrate that the CI's identity would be revealed, it has failed to meet it initial burden to establish that the informer's privilege applies in this case.

[24]    Still, even if we were to agree with the State that it had properly invoked the privilege, Jones has met his burden to demonstrate that the CI had information that is relevant and helpful to his defense or necessary for a fair trial. *See Beville*, 78 N.E.3d at 19. In his brief, Jones raises numerous questions that suggest the information from the CI would be helpful for him to understand how the officers investigating the robbery at Thompson's house linked him to that offense. Accordingly, we conclude that the trial court did not abuse its discretion when it granted Jones' motion to compel, and we affirm the trial court.

[25]    Affirmed.

Bradford, C.J., and Mathias, J., concur.